# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DARNELL BERNARD BLAGMON,

      Petitioner,

v.                                                 **Civil Action No. 3:19cv245**

WARDEN THOMAS MEYER,

      Respondent.

## MEMORANDUM OPINION

Petitioner Darnell Bernard Blagmon, a Virginia prisoner proceeding with counsel, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his convictions in the Circuit Court for the City of Virginia Beach, Virginia (the "Virginia Beach Circuit Court"). Blagmon argues that he is entitled to relief on the following ground:

| | |
|---|---|
| Ground One: | The Virginia courts violated Petitioner's right under the Due Process Clause of the United States Constitution [when the courts] denied relief to Petitioner despite Berdecia's affirmation and without holding an evidentiary hearing to properly consider Petitioner's Actual Innocence Petition. (§ 2254 Pet. 6.)[1] |

Respondent Warden Thomas Meyer filed a Motion to Dismiss, (ECF No. 9), asserting that Blagmon's habeas petition should be dismissed because Blagmon did not timely file his claim and the relevant statute of limitations bars relief. (ECF No. 9.) Blagmon filed a Response. (ECF No. 13.) Meyer did not reply. For the reasons set forth below, the Court will grant Meyer's Motion to Dismiss, (ECF No. 9), because Blagmon did not timely file his § 2254 Petition.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system for citations to Blagmon's submissions. The Court corrects the spelling, punctuation, capitalization, and spacing in the quotations related to Blagmon's postconviction submissions.

# I. BACKGROUND

## A. Jury Trial and Direct Appeal

In November 2006, Blagmon went to trial in the Virginia Beach Circuit Court on three counts: (1) murder during a robbery (felony murder), (2) robbery, and (3) use of a firearm in the commission of a felony (robbery). (*See* ECF No. 10–1, at 1.) At the beginning of the trial, the jury heard several stipulated facts about Blagmon going on a walk with Angel Berdecia and the murder victim, Keith Sears. (Nov. 28, 2006 Tr. 117–18.) During that walk, the parties stipulated that Sears was shot in the head and killed. (Nov. 28, 2006 Tr. 117–18.) The parties further stipulated that the bullet that killed Sears came from "a Hi-Point .390 automatic, Model CF380, Serial Number P90628, with a mounted Beamshot 1,000 laser under the barrel." (*Id.*) The parties also stipulated that Angel Berdecia's mother, Ruth Quinones, found the Hi-Point handgun in a trash can on her porch. (*Id.* at 118.) The parties agreed that the medical examiner recovered the .380 caliber bullet from Sears's brain "during [the examiner's] autopsy of the body on December 15, 2005." (*Id.* at 119.) The parties further stipulated that "various witnesses heard a shot early in the morning of December 14, 2005, but no one except Darnell Blagmon and Angel Berdecia can physically and directly identify the participants in the shooting or who killed Keith Sears." (*Id.* at 121.)

In addition to the stipulated facts, the jury heard testimony from the following individuals at trial: (1) Angel Berdecia, the only other person who witnessed the shooting of Keith Sears; (2) Detective Janine Hall, a detective who interviewed Blagmon after the incident; (3) John Rivera, an inmate incarcerated with Blagmon prior to trial; (4) Raquel Ramoutar, Berdecia's sister-in-law who discussed the murder and robbery with Blagmon after it occurred; (5) Dr. Leah Bush, the medical examiner who performed the autopsy on Sears; (6) Ruth Quinones, Angel Berdecia's mother and the person who found the Hi-Point gun in her trash can; and, (7) Ruth Damaso

2

Neely, a forensic scientist who conducted a DNA analysis on evidence retrieved from the crime scene. (*See* Nov. 28–29, 2006 Tr.)

Berdecia, one of the Commonwealth's primary witnesses at trial and the only other witness to Sears's murder, testified about the night of Sears' death. (Nov. 28, 2006 Tr. 125.) Berdecia testified that on the night Sears died, he and Blagmon went for a walk with Sears, during which he saw Blagmon wearing black gloves and "heard the gunshot." (*Id.* at 129–32.) Berdecia said that he "was behind both of them" when Sears was shot, and that he "picked up [Sears'] body with no choice" because Blagmon had threatened to shoot him also. (*Id.* at 132–33.) Berdecia stated that he and Blagmon "placed the body behind some bushes," (*Id.* at 133), and then he ran when Berdecia started going through Sears' pockets. (*Id.* at 135). During cross-examination, Counsel for Blagmon called into question Berdecia's credibility. (*See, e.g.*, Nov. 28, 2006 Tr. 145–48, 152–61). Counsel for Blagmon specifically asked Berdecia about lying to the police about Sears' murder, and Berdecia affirmed that he lied to the police on multiple occasions. (*Id.*)

After hearing the stipulated facts and trial testimony, the jury convicted Blagmon of one count of murder during a robbery (felony murder) and one count of robbery. (*See* ECF No. 10–1, at 1.) The jury acquitted Blagmon of use of a firearm in the commission of a felony. (*Id.* at 2.) On April 2, 2007, the Circuit Court sentenced Blagmon to thirty-five years of incarceration.[2] (*Id.* at 4.)

---

[2] The Circuit Court sentenced Blagmon to thirty years of incarceration on the felony murder charge and five years of incarceration on the robbery charge, which resulted in an aggregate sentence of thirty-five years of incarceration. (ECF No. 10–1, at 3.) The Virginia Department of Corrections lists Blagmon's release date as July 16, 2040. *See* Virginia Offender Locator (search for "Darnell Blagmon"), *available at:* https://vadoc.virginia.gov/general-public/offender-locator/.

Blagmon appealed, challenging the sufficiency of the evidence to support his convictions

of "robbery and first-degree murder during the commission of a robbery." (ECF No. 10–2, at 1.)

On November 2, 2007, the Court of Appeals of Virginia (the "Virginia Court of Appeals")

denied Blagmon's petition for appeal. (*Id.*) In rejecting Blagmon's sufficiency of the evidence

arguments for the robbery and murder convictions, the Virginia Court of Appeals concluded that

the evidence at trial showed:

> [Blagmon] approached Angel Berdecia outside of Berdecia's residence and told
> him [that Blagmon] needed to rob someone that night. Berdecia testified that
> [Blagmon] indicated he planned on robbing Keith Sears, who owed him
> approximately $65.00.
>     Later that evening, [Blagmon], Berdecia, and Sears were walking down the
> street when Berdecia heard a gunshot and saw [Blagmon] crouch over Sears' body
> and lift it up by the shoulders. Berdecia, who knew [Blagmon] was carrying a gun
> at the time, asked him, "What did you do? Why did you do that for? What's going
> on?" Berdecia assisted [Blagmon] in moving Sears' body behind bushes because
> [Blagmon] threatened to shoot Berdecia if he did not do so. [Blagmon] crouched
> over the body after they had moved it and told Berdecia to act as a lookout. While
> [Blagmon] was preoccupied, Berdecia ran away.
>     When Berdecia met with [Blagmon] later that night, [Blagmon] told him,
> "We take this to our graves. We don't tell nobody." [Blagmon] handed Berdecia
> $10.00, and Berdecia saw that [Blagmon] had "a bunch of twenties" in his pocket.
> Berdecia stated that he saw [Blagmon] wearing black gloves every time he handled
> the firearm. The next day, [Blagmon] returned and Berdecia returned the weapon
> to him. Ruth Quinones, Berdecia's mother, testified that a few weeks after the
> incident, as she emptied the trash for the first time after Sears' murder, she found
> what the police later confirmed to be a .380 handgun in a trashcan outside the house
> where she and Berdecia reside.
>     John Rivera testified that, while both men were incarcerated, [Blagmon]
> told him that, "He should have killed Angel while he had the chance." Rivera also
> stated that [Blagmon] told him that he had planned to rob Sears because he heard
> that Sears was carrying money. [Blagmon] told Rivera that he carried a gun while
> he, Berdecia, and Sears walked to the store. [Blagmon] admitted to Rivera that
> when he cocked the gun, Sears became upset, and Berdecia and Sears began
> struggling. During the struggle, [Blagmon] shot Sears, and he and Berdecia took
> money from Sears' pocket. During an altercation between Rivera and [Blagmon],
> [Blagmon] told Rivera, "I will kill you liked I killed [Sears]."
>     Raquel Ramoutar testified that after the police took Berdecia into custody,
> [Blagmon] repeatedly called her, saying, "Angel better shut his mouth, not say
> nothing because the police ain't got nothing on us." Dr. Leah Bush, assistant chief
> medical examiner, testified that Sears suffered a gunshot wound to the back of his

head and blunt force trauma. She stated that the bullet that was removed from Sears' head "resembles a .380 caliber."

(*Id.* at 1–3.) On March 19, 2008, the Supreme Court of Virginia refused Blagmon's petition for appeal. (ECF No. 10–3, at 1.)

## B. Postconviction Proceedings

On March 16, 2009, Blagmon filed a petition for writ of habeas corpus in the Virginia Beach Circuit Court. (ECF No. 10–4, at 1–7.) In his state habeas petition, Blagmon challenged the validity of his convictions on two grounds: (1) insufficient evidence; and, (2) improper jury instructions. (*Id.* at 5.) On June 11, 2009, because the "Supreme Court of Virginia has ruled that claims that were raised and decided in the trial court or on direct appeal are barred from consideration in a habeas proceeding," (*Id.* at 5–6), the Virginia Beach Circuit Court denied Blagmon habeas relief. Blagmon did not appeal the denial of his state habeas petition.

On October 6, 2017, over eight years later, Blagmon filed in the Virginia Court of Appeals a Petition for a Writ of Actual Innocence based on nonbiological evidence. (ECF No. 10–7, at 1–20.) Blagmon based his claim of innocence on a written statement that Angel Berdecia provided to him, which became "known or available to [Blagmon] on October 20, 2014." (*Id.* at 2.) The unsworn and undated handwritten document that Berdecia provided said that:

> On or about December 14, 2005, [Berdecia] was in a heated conversation with Mr. Keith Sears that resulted in a physical altercation. Which ultimately ended with the death of Mr. Keith Sears. There was never any argument or altercation between Mr. D. Blagmon and Mr. Keith Sears. I just want to bring forth the truth which is Mr. D. Blagmon never willingly aided or abetted, nor assisted in the death or robbery of Mr. Keith Sears. My reason for writing this wrong is, because Mr. D. Blagmon, was erroneously charged and convicted for crimes he is not responsible for committing. Mr. D. Blagmon is erronesouly convicted of the aforementioned crimes because of my coercive and falsified statement and testimony. Mr. D. Blagmon convictions must be reversed/overturned because he is not guilty of and

5

never has willingly aided or abetted in the aforementioned crimes which are murder and robbery.

(*Id.* at 9.)

In its November 15, 2017 Opinion evaluating Blagmon's Petition for Writ of Actual

Innocence, the Virginia Court of Appeals reviewed the evidence presented at trial and

summarized the evidence as follows:

> Blagmon was tried and convicted for the felony murder and robbery of Keith Sears on December 13, 2005.
>
> During the trial, the parties stipulated to the following facts: In the early morning hours of Wednesday, December 14, 2005, Sears, a/k/a "Flames," Blagmon, and Angel Berdecia walked together from Berdecia's residence. During the walk, Sears was shot in the head and killed. The bullet later removed from his brain was identified as a .380 caliber bullet and was fired from a distance of less than six inches. The gun that fired the bullet was found by Berdecia's mother in a trash can on her porch on January 5, 2006. It was wrapped in a brown paper bag.
>
> In addition to the stipulated facts, several witnesses testified at trial regarding statements Blagmon made concerning the offenses. Detective Janine Hall testified that she interviewed Blagmon on December 20, 2005, and that Blagmon told Hall that the idea to rob Sears originated with Berdecia, Blagmon's co-defendant. After initially denying any conversation with Berdecia prior to the robbery and murder, Blagmon eventually admitted that he and Berdecia discussed robbing Sears shortly before the robbery and shooting occurred. Berdecia told Blagmon that Berdecia was "tired of Sears staying at his house and eating up his food" without reimbursing Berdecia and that Berdecia was going to rob Sears.
>
> Upon Hall relating that Berdecia had told the police that the robbery idea originated with Blagmon, Blagmon disputed that claim; however, he did admit stating to Berdecia in the context of the robbery conversation that "it was Christmastime and he [Blagmon] needed to get some money." Blagmon told Hall that, after the two men discussed robbing Sears, Blagmon did not believe that Berdecia would follow through with the robbery. When Blagmon and Berdecia walked with Sears from Berdecia's house on the evening of December 14, 2005, Blagmon told Hall that Berdecia shot Sears without warning. Blagmon admitted to Hall that he helped Berdecia move Sears's body into an alley and then acted as a "lookout" while Berdecia went through Sears's pockets. When Berdecia and Blagmon met back at Berdecia's house that evening, Berdecia gave Blagmon $25.00 and kept a larger amount for himself. Blagmon told Hall he could not see exactly how much money Berdecia had, but Blagmon estimated it was around $150.00. Blagmon confirmed that Berdecia had no money prior to the robbery.
>
> During his interview with Hall, Blagmon admitted that, "two and a half to three weeks prior" to December 20, 2005, he had borrowed a loaded .380 caliber gun from a friend named "Wallace" and that the gun was at Berdecia's house.

John Rivera was incarcerated with Blagmon prior to trial and testified to statements made by Blagmon to him during their incarceration. Blagmon told Rivera that Blagmon knew that Sears had money on him on the night of the robbery and murder because Blagmon knew Sears intended to purchase drugs. Blagmon stated that he instructed Berdecia to get his gun before Blagmon and Berdecia left Berdecia's house with Sears. Blagmon told Rivera that Blagmon produced the gun during the outing with Berdecia and Sears, and Sears began "tussling" with Berdecia. Blagmon shot Sears during the fight with Berdecia and instructed Berdecia to go through Sears's pockets. Blagmon stated that Berdecia passed the money to him, but did not state how much money he received.

Rivera also testified that he, Rivera, eventually moved to a different cell block and that, shortly prior to the move, Blagmon expressed anger because he "felt like the neighborhood [had] really turned its back on him . . . ." Blagmon told Rivera, "I will kill you like I killed that n[****]r Flames."

In addition to the statements to the police and Rivera, Blagmon discussed the murder and robbery with Berdecia's sister-in-law, Raquel Ramoutar. Ramoutar, a member of the United States Navy, testified that Blagmon called her shortly after he was taken into custody in December 2005 and asked her where Berdecia was and for information about the case. When Ramoutar answered she did not know where Berdecia was, Blagmon told her that Berdecia "better shut his mouth, not say nothing because the police ain't got nothing on us." Ramoutar replied that he and Berdecia should cooperate with the police if they were innocent. Blagmon told her, "Oh, don't worry about it. I got everything taken care of. Snitches will get snitches."

Berdecia, who was also charged in connection with Sears's robbery and murder, testified that Blagmon was visiting Berdecia at the latter's home on the evening of Sears's murder. Sears, as well as Berdecia's mother and sister, were in the home that evening. At approximately 11:00 p.m. Berdecia and Blagmon walked outside to the porch and began talking. Berdecia testified that Blagmon told him that Blagmon wanted to rob Sears because Sears owed Blagmon money. Berdecia stated that he tried to talk Blagmon out of the plan to rob Sears.

Shortly thereafter, Sears came outside. When Blagmon announced he wanted to go for a walk, Sears and Berdecia agreed to accompany him. Although Berdecia knew that Blagmon was carrying a gun, Berdecia testified that he did not believe Blagmon was going to "do anything with it" and that Blagmon was "most likely" going to "scare" Sears when he confronted Sears about the debt owed Blagmon.

As the men walked, Sears led the way, followed by Blagmon and then Berdecia. Without warning, Berdecia heard a gunshot, followed by Sears lying on the ground. Berdecia exclaimed to Blagmon, "What did you do? Why did you do that for? What's going on?" Berdecia testified that Blagmon ordered Berdecia to help Blagmon conceal Sears's body behind some bushes, threatening to shoot Berdecia if he refused. After helping Blagmon move Sears, Berdecia fled from the scene.

Later that night, however, the two men met again. Blagmon told Berdecia, "We take this to our graves. We don't tell nobody." After giving Berdecia $10.00, Blagmon instructed Berdecia to hide Blagmon's gun in Berdecia's house.

At the conclusion of the evidence, the trial court instructed the jury on the law governing principals in the second degree and, during deliberations, the jury specifically inquired about the "exact definition of first and second principal, murder in the first degree." The trial judge referred the jurors to the instructions provided to them on principals in the first and second degree in the commission of a felony or robbery.

Following deliberations, the jury convicted Blagmon of first-degree murder and robbery, but acquitted him of use of a firearm in the commission of a felony.

(ECF No. 10–5, at 1-4.)

After considering the totality of the evidence and Berdecia's statement suggesting Blagmon's innocence, the Virginia Court of Appeals summarily dismissed the petition, holding, in pertinent part:

Here, Blagmon's petition fails to prove that Berdecia's new statement is true. First of all, the new statement simply disavows Berdecia's prior statements and testimony in a general manner without citing any specific evidence. While Berdecia's new statement asserts generally that Blagmon "never willingly aided or abetted, nor as[s]isted in the death or robbery" of Sears, it lacks a specific denial that Berdecia discussed the robbery with Blagmon prior to the offenses. Likewise, the statement omits any claim that Berdecia coerced Blagmon's participation in the offenses. Nothing in the new statement or in the petition cites evidence corroborating Berdecia's allegation that Blagmon was an unwilling participant. Thus, while this Court "is vested with broad discretion in determining whether the facts require further development" in a petition filed under Code §§ 19.2-327.10 through -327.14, Haas v. Commonwealth, 283 Va. 284, 291, 721 S.E.2d 479, 481 (2012), even if Berdecia provided more detailed testimony denying Blagmon's willing participation in further proceedings and recanted his original testimony, we conclude that nothing in his new testimony or in the petition proves that the new recantation evidence is, in fact, true. Thus, because Blagmon has failed to prove that the recantation evidence is true, he has failed to establish that it is "material." Carpitcher, 273 Va. at 345, 641 S.E.2d at 492.

Not only has Blagmon failed to prove that the new evidence is true, he has also failed to prove that the new evidence, "when considered with all the other evidence in the current record," is such that "no rational trier of fact [w]ould have found him guilty of the crimes." Id. at 347, 641 S.E.2d at 493. Based upon Blagmon's statements to the police and other witnesses, Blagmon admitted he knew that Berdecia wanted to rob Sears on the night of December 13, 2005, provided the gun to Berdecia that was used to commit the robbery and murder, knew that Berdecia was armed when the three of them left Berdecia's house together, assisted Berdecia in moving Sears's body from view after Sears was shot, acted as a lookout while Berdecia went through Sears's pockets, and shared in the robbery proceeds.

Regardless of whether Blagmon or Berdecia was the gunman, such evidence was sufficient for a rational fact finder to conclude that Blagmon acted as

a principal in the second degree. "It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." McMorris v. Commonwealth, 276 Va. 500, 505, 666 S.E.2d 348, 351 (2008). See Code § 18.2-18 (in felony cases, except most capital murders, principal in second degree may be indicted, tried, convicted and punished in all respects as if principal in first degree). Based upon the jury's question about principals in the second degree and its acquittal of Blagmon on the firearm charge, the jury convicted Blagmon of murder and robbery despite concluding that Blagmon was not the gunman.

As Blagmon has failed to establish the truth of Berdecia's new statement by clear and convincing evidence, he has not offered newly-discovered evidence that is "material" within the meaning of Code §§ 19.2-327.10 through -327.14. He has also failed to allege evidence that, "when considered with all of the other evidence in the current record, will prove that no rational trier of fact [w]ould have found proof of guilt beyond a reasonable doubt." Carpitcher, 273 Va. at 347, 641 S.E.2d at 493. In short, he has "failed to offer any evidence that he is factually innocent." Altizer, 63 Va. App. at 328, 757 S.E.2d at 570.

(ECF No. 10–5, at 6–7.)

Blagmon appealed the denial of his Petition for a Writ of Actual Innocence to the Supreme Court of Virginia. In his petition for appeal, Blagmon raised two assignments of error: (1) that the Virginia Court of Appeals erred in ruling that Blagmon's petition failed to prove the truth of Berdecia's statement without the benefit of an evidentiary hearing; and, (2) the Virginia Court of Appeals erred in ruling that the new evidence, when considered with all the other evidence in the current record, is such that no rational trier of fact would have found him guilty of the crimes. (ECF No. 10–6, at 1.) Blagmon asserted that, without an evidentiary hearing, the Virginia Court of Appeals could not properly determine the veracity of Berdecia's statement and therefore could not assess his claim. (ECF No. 2, at 11.) On July 23, 2018, the Virginia Supreme Court denied Blagmon's petition for appeal from the denial of his Petition for a Writ of Actual Innocence. (ECF No. 10–6, at 1.) On December 10, 2018, the Supreme Court of the

United States denied his petition for writ of certiorari. *Blagmon v. Virginia*, 139 S. Ct. 655 (2018). On April 8, 2019, the Court received the instant § 2254 Petition.[3] (§ 2254 Pet. 1.)

## II. ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, sets a one-year statute of limitations for seeking federal habeas corpus relief from a state-court judgment. 28 U.S.C. § 2244(d)(1). Here, Meyer invokes the one-year statute of limitations as an affirmative defense in response to Blagmon's § 2254 Petition. *Hill v. Braxton*, 277 F.3d 701, 705 (4th Cir. 2002) ("the one-year limitation period contained in § 2244(d) is an affirmative defense that the state bears the burden of asserting'). Because Blagmon did not timely file his § 2254 Petition, and none of the exceptions to the limitations period toll the filing deadline, the Court will grant the Motion to Dismiss.

### A.    The One-Year Statute of Limitations Bars Blagmon's § 2254 Petition

A one-year statute of limitations applies to habeas petitions in non-capital cases for persons convicted in state court. *See* 28 U.S.C. § 2244(d)(1); *Wall v. Kholi*, 562 U.S. 545, 550 (2011). The limitations period may be tolled, however, if certain statutory exceptions are met. 28 U.S.C. § 2244(d)(1)–(2). Specifically, Section 2244(d)(1) provides that:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[3] Counsel for Blagmon did not attach Berdecia's actual statement to the § 2254 Petition or the Memorandum in Support of the § 2254 Petition. (*See* ECF Nos. 1–2.) Rather, Counsel stated that Berdecia "affirm as follows" and then block quoted Berdecia. (Mem. Supp. § 2254 Petition 7, ECF No. 2). The Court relies on the Commonwealth's records for an actual copy of Berdecia's statement, which shows a handwritten note from Berdecia that is neither sworn nor dated. (ECF No. 10-7.)

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Section 2244(d)(2) further provides that "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" tolls the one-year limitation period for filing a federal habeas petition. 28 U.S.C. § 2244(d)(2). None of the statutory exceptions provided in § 2244(d) apply here.

First, the exceptions listed in § 2244(d)(1)(A)–(D) do not apply to render Blagmon's § 2254 Petition timely. On June 18, 2008 Blagmon's conviction became final. On April 8, 2019, more than a decade after his conviction became final, Blagmon filed his § 2254 Petition in this Court. (*See* § 2254 Petition at 3.) Under both § 2244(d)(1)(A) and § 2244(d)(1)(D), Blagmon did not timely file his § 2254 Petition because he filed it more than one year after his judgment became final and more than one year after he states that he discovered the factual predicate underlying his claims: Berdecia's 2014 handwritten and unsworn note. Nor does a factual basis exist to find Blagmon's petition timely under § 2244(d)(1)(B) and (C) because no State or United States Supreme Court action is implicated.

Second, the tolling provision contained in § 2244(d)(2) does not assist Blagmon. That subsection provides "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Although Blagmon filed a state habeas corpus petition on March 16, 2009, the Virginia Beach Circuit Court denied his petition on June 11, 2009. As a result, Blagmon had no application for State postconviction or other collateral review pending between June 11, 2009,

and October 6, 2017, the date he filed his Petition for a Writ of Actual Innocence.[4] Accordingly, the one-year statute of limitations for filing federal habeas petition, though tolled briefly for three months in 2009 during the resolution of his state habeas petition, expired years before he filed his Petition for a Writ of Actual Innocence in state court and his § 2254 Petition in this Court.

Even if the Court considers Blagmon's § 2254 Petition filed based upon newly discovered evidence, he cannot overcome the time bar. Blagmon contends that he became aware of the factual predicate for his actual innocence claim—Berdecia's statement—in October 2014. (ECF No. 10–7 at 2 (stating evidence became known or available to Blagmon on October 20, 2014).) To the extent that Blagmon may claim that this "newly discovered" evidence operates to reset the one-year filing deadline under 28 U.S.C. § 2244(d)(1)(D), that claim fails because Blagmon waited nearly three years to pursue postconviction relief based on this evidence without justification for his significant delay.

Blagmon, however, contends that the one-year statute of limitations did not begin running until July 23, 2018, when the Supreme Court of the United States denied his petition for writ of certiorari regarding the Virginia Supreme Court's decision to reject his Petition for a Writ of Actual Innocence. (§ 2254 Petition, at 14.) This argument falters because Blagmon's Petition for a Writ of Actual Innocence did not toll the statute of limitations. Rather, the limitations period had already expired when Blagmon filed his Petition for a Writ of Actual Innocence in

---

[4] The one-year statute of limitations expired on Monday, September 14, 2009. To make this calculation, the one-year clock began running on June 18, 2008, when Blagmon's conviction became final. The clock stopped 271 days later, on March 16, 2009, when Blagmon "subscribed" his state habeas petition. (ECF No. 10–4, at 5); *Houston v. Lack*, 487 U.S. 266, 270–72 (1988) (utilizing prison mailbox rule, court must deem petition filed upon delivery to prison mailroom officials). On June 11, 2009, the state court denied his habeas petition, which restarted the one-year clock. With ninety-four days remaining on the one-year limitations period, Blagmon had until Monday, September 14, 2009, to timely file his § 2254 Petition or otherwise toll the statute. His 2017 Petition for Writ of Actual Innocence exceeds that deadline by nearly eight years.

state court. *Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000); *see also Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) ("We therefore hold that proper calculation of Section 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run."); *Ballard v. Cuccinelli*, 2011 WL 1827866, at *2 (E.D. Va. May 12, 2011) ("[A] state post conviction motion filed after expiration of the limitations period cannot toll the period, because there is no period remaining to be tolled." (quoting *Deville v. Johnson*, 2010 WL 148148, at *2 (E.D. Va. Jan. 12, 2010))). Because the limitations period does not begin anew after completion of postconviction proceedings, Blagmon's Petition for a Writ of Actual innocence did not reset the limitations period. As a result, Blagmon did not timely file his § 2254 Petition.

Blagmon, however, cites the actual innocence exception to avoid the statute of limitations bar. Blagmon argues that his "assert[ion of] actual innocence of the crimes of which he stands convicted, [provides] a gateway through which a habeas petitioner may pass despite the passage of the AEDPA's one year time period." (§ 2254 Petition at 14.) As articulated below, the Court rejects Blagmon's actual innocence claim.

## B. The Actual Innocence Equitable Exception Does Not Apply to Blagmon

Blagmon contends that his actual innocence claim serves as a gateway through which his untimely petition may be considered, thus allowing the Court to review the evidence sustaining his convictions. (§ 2254 Petition at 13–14 (citing *McQuiggin v. Perkins*, 569 U.S. 383 (2013) and *Finch v. McKoy*, 914 F.3d 292 (4th Cir. 2019)). Blagmon contends that the state courts violated his right to due process by allowing his conviction to stand despite showing that it is premised on false material testimony presented at his jury trial.[5] (Mem. Supp. § 2254 Pet. 13,

_____

[5] To the extent Blagmon alleges that the Commonwealth violated its duties pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959), his claim fails. Berdecia's statement does not indicate

13

ECF No. 22.) To support his argument Blagmon presents a handwritten statement from Berdecia that states generally that Blagmon "never willingly aided or abetted, nor assisted in the death or robbery" of Sears. (ECF No. 10-7 at 9.) Because "there was no forensic or objective evidence showing that Blagmon was the perpetrator of the robbery, . . . no rational trier of fact would or could have found Mr. Blagmon guilty of robbery and felony murder beyond a reasonable doubt." (Mem. Supp. § 2254 Pet. 16, ECF No. 22.) At the very least, Blagmon argues, this Court must direct the state court told hold an evidentiary hearing on the truth or falsity of Berdecia's statement. (Mem. Supp. § 2254 Pet. 17, ECF No. 22.)

## 1. Actual Innocence Provides an Equitable Exception to the Time Bar

An actual innocence claim "'is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons.'" *Finch v. McKoy*, 914 F.3d 292, 294 (4th Cir. 2019) (quoting *McQuiggin*, 569 U.S. at 392). "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin*, 569 U.S. at 392. Thus, the Court may reach a concededly time-barred § 2254 Petition if "new evidence

---

that the Commonwealth knowingly used false evidence, including false testimony, to obtain a tainted conviction or allowed it to go uncorrected when it appeared. *Napue*, 360 U.S. at 269. Because a *Napue* violation can be found only for *knowingly* offering or failing to correct false testimony, this reveals a fatal flaw in Blagmon's claim. Apart from Blagmon's assertion, that the Commonwealth *knew* that Berdecia was lying when he testified at trial, no evidence of a *Napue* violation exists in the record. If, hypothetically, the Commonwealth learned of the alleged false testimony when Blagmon presented Berdecia's statement several years after his trial, the Commonwealth could not have done anything to preemptively correct Berdecia's trial testimony. Moreover, Blagmon's *Napue* claim would falter on materiality even if the other elements were met. The stipulated facts stated that Berdecia and Blagmon were the only two people who know who shot and killed Sears, which Berdecia's general statement does not refute. The jury convicted Blagmon of robbery and felony murder. The jury did not convict Berdecia of using a firearm in the commission of a felony. Berdecia now belatedly claims that Blagmon was not involved in the death of Sears, but that lone statement does not overcome the other evidence presented at Blagmon's trial, including Blagmon's undisputed presence at the scene of Sears' death.

shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Id.* at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

In the context of an untimely petition, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggin*, 569 U.S. at 399. "It would be bizarre to hold that a habeas petitioner who asserts a convincing claim of actual innocence may overcome the statutory time bar § 2244(d)(1)(D) erects, yet simultaneously encounter a court-fashioned diligence barrier to pursuit of [his] petition." *Id.* "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 392 (citation omitted).

### 2. A Valid Actual Innocence Claim Requires New Reliable Evidence

"New reliable evidence of actual innocence creates a gateway for a habeas petitioner to present procedurally defaulted federal constitutional claims by allowing an equitable exception to the limitations provisions of 28 U.S.C. § 2244(d)(1) to prevent a fundamental miscarriage of justice." *Hayes v. Carver*, 922 F.3d 212, 216 (4th Cir. 2019). To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial. *Schlup*, 513 U.S. at 324. "A valid actual innocence claim requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Hayes*, 922 F.3d at 216 (internal quotation marks and citation omitted). "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316.

The United States Supreme Court has "caution[ed], however, that tenable actual-innocence gateway claims are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (brackets omitted) (quoting *Schlup*, 513 U.S. at 329). The gateway actual innocence "standard is demanding and permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (citation omitted); *see also McQuiggin*, 569 U.S. at 401 ("We stress once again that the [actual innocence] standard is demanding."). Where "none of [the] evidence contradicts, or even undermines, the essential testimony of the identifying witnesses or the State's other evidence," the petitioner does not meet this stringent standard. *Hayes*, 922 F.3d at 217.

"At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. "Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Teleguz v. Zook*, 806 F.3d 803, 809 (4th Cir. 2015) (citing *House*, 547 U.S. at 538). The actual innocence determination "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (internal citation and quotations omitted); *see also Finch*, 914 F.3d at 299 (accord).

Moreover, "actual innocence" means factual innocence and not just legal insufficiency. *See Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (alteration in original) (citations and internal quotation marks omitted) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence."). Furthermore, with respect to claims of actual innocence,

The Supreme Court has instructed that, "when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"

*Carter v. Commonwealth of Va.*, No. 3:09CV121–HEH, 2010 WL 331758, at *4 (E.D. Va. Jan. 26, 2010) (quoting *House*, 547 U.S. at 537).

The Court reviews below the evidence on which Blagmon relies to support his actual innocence claim.

### a. Blagmon Presents Unreliable Evidence to Proclaim His Innocence

Here, the only evidence Blagmon submits to support his actual innocence claim was an unsworn and undated letter from Berdeciastating that Blagmon "is not guilty of, and never has willing[ly] aided or abetted in the aforementioned crimes which are murder and robbery." (ECF No. 10–7, at 9.) The Virginia Court of Appeals did not err when determining that Berdecia's postconviction profession of Blagmon's innocence lacked reliability. Considering Berdecia's prior statements implicating Blagmon and because Blagmon presented only an unsworn letter from Berdecia that did not specifically recant his prior testimony, such evidence is "not 'trustworthy' and does not constitute 'reliable' evidence of innocence sufficient to support a claim of actual innocence."[6] *Carter v. Virginia*, No. 3:09CV121–HEH, 2010 WL 331758, at *6 (E.D. Va. Jan. 26, 2010) (quoting *Schlup*, 513 U.S. at 324). "To accept such commonplace

---

[6] Berdecia provided only a handwritten statement that he did not date or have notarized. *See Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (internal quotation marks and citations omitted) (discussing the need for an oath if a notary provides a jurat, "which means that the affiant has sworn to the truth of the document's contents"). Nor did Berdecia swear to the truth of the statement under penalty of perjury, adding further doubt about the document's reliability. *See* 28 U.S.C. § 1746(2) (setting forth requirements for writings provided "under penalty of perjury").

declarations would ignore the Supreme Court's admonition that the quality of evidence necessary to support a claim of actual innocence 'is obviously unavailable in the vast majority of cases.'" *Id.* (quoting *Schlup*, 513 U.S. at 324). *See United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (observing that "unsworn statements in memoranda . . . do not constitute evidence") (remanded for evidentiary hearing on different evidence). Accordingly, the Court concludes that Blagmon did not present reliable evidence of innocence to support his actual innocence claim.[7]

### b.    The Totality of the Evidence Supports Blagmon's Convictions

Despite the deficient evidence Blagmon presents to support his actual innocence claim, the Court, in the interest of justice, nonetheless reviews the evidence presented at trial along with Berdecia's unsworn statement to assess Blagmon's actual innocence claim. Given the totality of the evidence, the Court concludes that Blagmon fails to demonstrate "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Sharpe*, 593 F.3d at 377 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). In evaluating the petitioner's claim, "the district court is not bound by the rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327–28 (internal quotation marks omitted). Rather, the court must consider "all the evidence, including that alleged to have been illegally admitted

---

[7] Furthermore, Blagmon's assertion that the Court should afford him federal habeas relief fails because any alleged infirmities in a state postconviction action, such as the decision not to hold a hearing, are not matters that federal courts address in habeas actions. *Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (due process claims are not cognizable on federal habeas review "even where there is some error in state post-conviction proceedings"). Blagmon does not argue that the Virginia Court of Appeals failed to regularly and consistently apply its own rules regarding postconviction evidentiary hearings. *See, e.g., Woodfolk v. Maynard*, 857 F.3d 531, 543 (4th Cir. 2017) ("if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim") (internal quotation marks and citation omitted). In any event, the record shows that the Virginia Court of Appeals carefully considered Berdecia's statement and the evidence from Blagmon's trial before finding that Berdecia's statement did not warrant an evidentiary hearing, undermining Blagmon's due process violation claim.

(but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.*

While the evidence against Blagmon introduced at trial **was** primarily circumstantial, substantial and compelling evidence existed to support the jury's verdict. The jury first heard stipulated facts placing Blagmon at the crime scene: specifically, Blagmon was on a walk with the victim, Keith Sears, and Berdecia during which Sears was shot in the head and killed. (Nov. 28, 2006 Tr. 117–18.)

In addition to the stipulated facts, the jury heard testimony from the following individuals: (1) Angel Berdecia, the only other person who witnessed the shooting of Keith Sears; (2) Detective Janine Hall, a detective who interviewed Blagmon after the incident; (3) John Rivera, an inmate incarcerated with Blagmon prior to trial; (4) Raquel Ramoutar, Berdecia's sister-in-law who discussed the murder and robbery with Blagmon; (5) Dr. Leah Bush, the medical examiner who performed the autopsy on Sears; (6) Ruth Quinones, Angel Berdecia's mother and the person who found the Hi-Point gun; and, (7) Ruth Damaso Neely, a forensic scientist who conducted a DNA analsyis on evidence retrieved from the crime scene. (*See* Nov. 28–29, 2006 Tr.)

Detective Hall testified that, after reading Blagmon his *Miranda* rights, (Nov. 29, 2006 Tr. 254), he admitted "that he helped Mr. Berdecia move Mr. Sears'[s] body in between the second and third house in the alleyway." (*Id.* at 264.) Detective Hall also testified that Blagmon admitted that, after Berdecia allegedly shot Sears, he and Berdecia had retrieved money from Sears's pockets and distributed it between themselves. (*Id.* at 264, 268–69.)

John Rivera testified that, while incarcerated with Blagmon, Blagmon told him that "he should have killed Angel while he got the chance to kill Angel." (Nov. 28, 2006 Tr. 194.) Rivera also testified that Blagmon told him that "Sears and Angel was on the ground tussling,

and [Blagmon] said that's when he let a shot off." (*Id.* at 196.) Rivera testified that "[Blagmon] say he pointed the gun at Angel and told Angel to get the money out and then they left from out of there." (*Id.* at 197.) Later, Rivera testified that he got into an altercation with Blagmon while in prison, and that during that dispute Blagmon said "he felt like the neighborhood really turned its back on him; and . . . I [will] kill you like I killed [Sears]." (*Id.* at 198.)

Raquel Ramoutaur, Berdecia's sister-in-law, also testified about her conversations with Blagmon regarding the murder and robbery. Ramoutar testified that she was with Ruth Quinones when Ruth found the gun in her trash. (Nov. 29, 2006 Tr. 277–78.) Ramoutar further testified that Blagmon "kept calling my phone asking what was going on, where's Angel at, where's Ruth at, where's Giselle at?" (*Id.* at 280.) Ramoutar testified "that's when [Blagmon] was like, Angel better shut his mouth, not say anything because the police ain't got nothing on us." (*Id.* at 280–81.) Ramoutar asked Blagmon, "If y'all did nothing, you know, why not cooperate?" (*Id.* at 281.) Ramoutar testified that Blagmon responded, "Oh don't worry about it. I got everything taken care of. Snitches will get snitches. (*Id.* at 281.)

Ruth Quinones, Angel Berdecia's mother, testified that on January 4, [2006], she "found a gun in a bag." (Nov. 28, 2006 Tr. 176.) Dr. Leah Bush testified that on December 15, 2005 she performed an autopsy on Keith Sears. (Nov. 28, 2006 Tr. 214.) Dr. Bush testified that Sears suffered "a single gunshot wound" behind his right ear. (*Id.* at 218.) Dr. Bush explained that "the bullet entered the right back of his head and came to rest forward, right to left, and upward inside the left side of his head." (*Id.* at 219.) Dr. Bush testified that this gunshot caused Sears's death. (*Id.* at 223.) Ruth Neely testified that she conducted DNA analyses on evidence recovered from the crime scene. (Nov. 29, 2006 Tr. 238.) When testing the hand grip and

trigger of the gun recovered from Quinones' trash, Neely could not eliminate Berdecia as a contributor but eliminated Blagmon and Sears.[8] (*Id.* at 242.)

Berdecia also testified about the events that took place surrounding Sears's murder. (Nov. 28 Tr. 122–68.) Berdecia testified that he was cooperating with the Commonwealth in exchange for a cap on his sentence. (*Id.* at 123.) Berdecia testified that he, Sears, and Blagmon went on a walk. (*Id.* at 129.) During that walk, Berdecia stated that Blagmon had on black gloves. (*Id.* at 132.) When the three men approached "Lake Edward Drive in between East Hastings and Lake Edward Drive; and when [they] crossed over, and [they] got to the front of the alley behind West Hastings, [Berdecia] heard the gunshot." (*Id.*) Berdecia testified that he asked Blagmon, "What did you do?" (*Id.* at 133.) In response, Blagmon said "Help me move the body. If not, I'm going to shoot you; and If you try to run, I'm going to shoot you in the back." (*Id.*) Berdecia testified that Blagmon began going through Sears' pockets, at which point Berdecia fled the scene. (*Id.* at 136–37.) Berdecia further testified that when he saw Blagmon again shortly after the incident, Blagmon had "[a] bunch of twenties" on him that he did not have before the walk. (*Id.* at 137.)

Looking at all of the evidence, the Court recognizes that Berdecia's general statement contradicts his trial testimony regarding Blagmon's direct involvement in Sears's murder. "[W]here, as here, the new evidence consists entirely of testimony that challenges the facts on which the prosecution relied in obtaining the conviction, the court must carefully consider the nature of the testimony in light of the existing record to determine whether it can be considered reliable." *Doe v. Menefee*, 391 F.3d 147, 165 (2d Cir. 2004) (citing *Schlup*, 513 U.S. at 327–28;

---

[8] As previously discussed, the jury found Blagmon not guilty of using a firearm in the commission of a felony. The jury also heard testimony regarding Blagmon using gloves to handle the firearm.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). As discussed above, the

trustworthiness and reliability of Berdecia's affidavit is questionable due to, *inter alia*, the fact

that the statement was neither sworn nor dated, the delayed timing of the statement, the

statement's generality and lack of specific recantation, Berdecia's failure to explain why he lied

and identified Blagmon as the shooter, and Berdecia's failure to identify the actual shooter,

which, based on the stipulated facts, would implicitly be himself.

Berdecia's credibility was also an issue during Blagmon's trial, and defense counsel

repeatedly questioned Berdecia's credibility during cross-examination. (*See, e.g.*, Nov. 28, 2006

Tr. 145–48, 152–61). For example, Berdecia acknowledged that he had lied to the police when

he initially told them that he "walked with Keith [Sears] to the corner and then returned home,"

(*Id.* at 153), and that he lied to the police when he said he "did not hear a gunshot that night."

(*Id.* at 158). Crediting Berdecia's statement, in which he indicates that Blagmon was not directly

involved in the shooting of Sears, essentially adds inconsistent statements for the jury to

consider.

Thus, after considering all of the evidence, the Court concludes that the evidence of

Blagmon's guilt, although primarily circumstantial, amounts to substantial and compelling

evidence, while the evidence of his innocence does not. At Blagmon's trial, after hearing the

stipulated facts and the testimony of the Commonwealth's witnesses, including Berdecia's prior

inconsistent statements and admissions that he had initially lied to the police, the jury found the

testimony of the Commonwealth's witnesses to be credible and convicted Blagmon. Further, as

previously noted, Berdecia's statement that Blagmon provides gives no explanation as to why

Berdecia lied, saying only that Blagmon was erroneously convicted. It also does not explain

why Berdecia waited five years after Blagmon's trial to come forward.

Blagmon also fails to provide any explanation about the circumstances surrounding the creation of Berdecia's statement, such as how Blagmon received a copy of it. Based on the unreliable circumstances surrounding the creation of Berdecia's statement, any reasonable juror would give substantial weight to Berdecia's prior sworn statements at trial, as opposed to Berdecia's unsworn statement that does not recant specific evidence or refute the stipulated facts. Given the totality of the evidence, including the new evidence Blagmon provides, Blagmon fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Sharpe*, 593 F.3d at 377 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). Accordingly, the actual innocence equitable exception does not apply to render his § 2254 Petition timely.

### III. CONCLUSION

Blagmon files his § 2254 Petition several years out of time. Although a showing of actual innocence would allow the Court to consider his untimely petition, Blagmon fails to support his actual innocence claim with new reliable evidence. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 523 U.S. at 315–17. Accordingly, the Motion to Dismiss, (ECF No. 9), will be granted. Blagmon's claims will be dismissed and the § 2254 Petition, (ECF No. 1), will be denied.

When a district court dismisses a habeas petition solely on procedural grounds, a certificate of appealability will not issue unless the petitioner can "demonstrate both (1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001)

(quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  This Court declines to issue such a certificate.  Blagmon may still request that the United States Court of Appeals for the Fourth Circuit issue the same.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: October 15, 2019
Richmond, Virginia